AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. 3:22-mj-00353
)
4242 Gardendale Ave. )
Dayton, Ohio 45417 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**See Attachment A**

located in the ____Southen____ District of ____Ohio____, there is now concealed *(identify the person or describe the property to be seized)*:

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance. |

The application is based on these facts:
**See Attached Affidavit.**

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ____*)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

TFO Dustin Phillips, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__Telephone__ *(specify reliable electronic means)*.

Date: 10/25/22

City and state: Dayton, Ohio

Peter B. Silvain, Jr.
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Dustin J. Phillips, a Task Force Officer ("TFO") with both the Federal Bureau of Investigation ("FBI") and City of Dayton Police Department ("DPD"), hereby make the following sworn statement under penalty of perjury:

## INTRODUCTION

1. I have been employed as a sworn law enforcement officer with the DPD for the past fifteen (15) years. I currently am a Detective with the DPD. I am also presently assigned as a TFO with the FBI Dayton Resident Office's Safe Streets Task Force (SSTF). As such, I am sworn under the Title 21, United States Code ("U.S.C."), Section 878, and am authorized to serve as a law enforcement officer of the United States duly authorized to conduct federal criminal investigations and execute federal arrests for violations of offenses set forth under Titles 18 and 21 of the U.S.C.

2. I am also a TFO with the DPD's Major Case/Drug Enforcement Unit. Since 2013, I have concentrated on narcotics, firearms, and gang-related criminal investigations. During my law enforcement career, I have attended numerous law enforcement training courses and seminars concerning the investigation of drug trafficking organizations. I have participated in many firearm-related arrests and executions of search warrants that have resulted in the seizure of large quantities of narcotics and firearms. I have additionally participated in many undercover - purchases of narcotics, and supervised the activities of police informants. I have also personally participated in investigating individuals suspected of possessing, manufacturing, distributing, and importing large quantities of various controlled substances. Based on my extensive law enforcement training and experience – I am familiar with the various manners and means drug traffickers and their criminal organizations typically employ within the United States. Based on

my training and experience, I am familiar with the typical *modus operandi* employed by individual criminals and criminal organizations involved in the illicit distribution of controlled substances. As such, I know the following:

- a. It is common practice for drug traffickers to conceal their criminal assets, their addresses, their telephone numbers and their telephone beeper/pager services through the use of third parties to avoid detection by law enforcement officials.

- b. It is also common practice for drug traffickers to maintain residences or so-called "stash houses" to store and distribute drugs  Additionally they will commonly use "nominees" to obtain telephone services, utility services, and other miscellaneous services to conceal their true identity and criminal involvement.

- c. It is also common practice for drug traffickers to place personal assets under the purported name/title of corporate entities in order to avoid detection of those assets by law enforcement officials.

- d. It is also common practice for drug traffickers to maintain *de facto* dominion and control over said assets.

- e. It is also common practice for drug traffickers possess large amounts of U.S. Currency in further the ongoing operation of their illicit drug business.

- f. It is also common practice for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The said books, records, receipts, notes, ledgers, and other documents are commonly maintained by drug traffickers in locations wherein they enjoy a ready access to them.

- g. It is also common for drug traffickers to provide false information to law enforcement officials regarding their actual identity and personal residences.

- h. It is also common for drug traffickers to conceal from law enforcement their connection, control and/or ownership of vehicles, business assets, drug inventories, large amounts of currency, financial instruments, jewelry, and evidence of financial transactions relating to the acquisition and concealment of large sums of money that are tied to their drug trafficking activities.

- i. It is also common for drug traffickers to amass large proceeds from the sale of drugs, and then subsequently attempt to hide the true source of these profits, to wit: launder money.  To accomplish this, drug traffickers typically utilize banks and/or other financial institutions to use cashier's checks, money drafts, and letters of

2

credit. Other institutions commonly used include real estate firms and other legitimate business fronts.

j. It is also common for drug traffickers to travel to facilitate their drug trafficking activities. Specifically, it is common for drug traffickers to transport, or cause to be transported, wholesale drug shipments from source cities to other locations where retail distribution will occur. Common methods of transportation include, but are not limited to, the use of commercial airlines, and rental/private automobiles and trucks.

k. It is also common for drug traffickers to maintain books, ledgers and other documents which reflect names, addresses, and/or telephone numbers of their customers, criminal associates and conspirators. This information is often be stored in cellular phones in places such as the contacts list.

l. It is also common for drug traffickers to take, or cause to be taken, photographs of themselves, their associates, their property and their drug product. These photographs have been known to be maintained and stored at their personal residences and/or businesses. These photographs have been known to be commonly be stored in personally owned cellular phones.

m. It is also common for drug traffickers to commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are commonly used to protect and secure a drug trafficker's person and property which may include, but is not limited to, narcotics, jewelry, drug paraphernalia, books, records, and U.S. Currency.

n. It is also common for drug traffickers to maintain hidden compartments inside their residences and vehicles to secret drug trafficking related evidence, i.e., money, ledgers, drugs, etc. It additionally common for drug traffickers to bury evidence in containers such as shoe boxes, or secret evidence in personal safes and lock boxes.

o. It is also common for drug traffickers to refrain from openly discussing drug related topics and details on the telephone, i.e., specific drug quantities, prices, dates, and methods of delivery of drugs, etc. These types of detailed conversations are more typically engaged in during face-to-face private transactions. As such, most drug trafficking related telephone conversations tend to be very brief in duration and oftentimes use "coded" or "street" language". Such conversations are typically only understood by the traffickers themselves and designed to mislead or confuse non-participants of the conversations. Drug traffickers tend to make extensive use of cell phones and text messaging beepers/pagers to facilitate their communications. When calling a beeper or text messaging, drug traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The typical structure of a drug distribution organization consists

of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors typically have more than one source of supply; likewise, the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his/her closest associates. Most of the drugs, (as well as diluting and packaging materials and weighing equipment), are typically stored at the "stash house."

p. It is also common for drug traffickers to use rental vehicles for everyday travel. They will also typically maintain another vehicle(s), usually at an out of sight location, to otherwise facilitate their drug trafficking business. Drug traffickers commonly title their vehicles in the names of third parties.

q. It is also common for drug traffickers to have saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed on their cell phone(s).

r. Based upon my prior training and experience, I have repeatedly observed drug traffickers distribute a cell phone number to their drug customers, which is referred to as a "money phone." These money phones are primarily used to communicate with retail drug customers. These customers call the drug trafficker on that cell phone number to arrange a purchase of drugs as needed. The drug trafficker will often times simultaneously field calls from several customers, directing their customers to travel by car to a designated meet location. Once all the customers have arrived at the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then depart the scene.

## PURPOSE OF AFFIDAVIT

3. I make this affidavit in support of an application for a search warrant for the residential premises known as 4242 Gardendale Avenue, Dayton, Ohio 45417, including all outbuildings, basements, garages, or sheds located on its curtilage, (hereinafter "**Location 1**"). **Location 1** is more fully described in Attachment A, which is incorporated herein by reference. As detailed below, I submit that probable cause presently exists to believe that certain evidence of drug trafficking, to wit: Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 841, can and will be found inside **Location 1.**

4

4.     A specific list of items to be seized from **Location 1** are described in Attachment B, which is also incorporated herein by reference. I have elected not to include every detail known to the present investigation, but only have set forth information deemed necessary to establish probable cause that the evidence associated with above-described drug trafficking offense is located at **Location 1**.

## PROBABLE CAUSE

5.     On June 8, 2022, U.S. Magistrate Judge Caroline H. Gentry issued a search warrant in Case No. 3:22-mj-185 for premises located at 4242 Gardendale Avenue believed to be occupied by **IREIN EDWIN JOHNSON**, (hereinafter referred to as "**JOHNSON**"). This search warrant was executed, however **JOHNSON** was not then located inside said premises.

6.     A search of the residence and curtilage led to the recovery of several items of evidentiary value including but not limited to: four (4) loaded firearms, several baggies of narcotics, several items of possessory interest linking **JOHNSON** to this residence. Detectives located a variety of items considered to be *drug paraphernalia* as this term is defined under 21 U.S.C. § 863(d), to wit: a digital scale with suspected fentanyl residue, a bullet mixer with suspected fentanyl residue, a plate with suspected fentanyl residue, and empty gelatin capsules. All of these items were located in close proximity in the kitchen area. As such, it appears each of these items were being actively used for illegal drug manufacturing.

7.     All of the baggies of suspected narcotics were submitted to the Miami Valley Regional Crime Laboratory (MVRCL) for forensic testing. The MVRCL has confirmed that all the suspected narcotics found inside the residence were in-fact controlled substances. The following is a list of confirmed narcotics located inside the house: four (4) baggies of a mixture of Fentanyl, also known as N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide, a Schedule II controlled substance, and para-Fluorofentanyl, an analog of Fentanyl and Schedule II controlled

5

substance weighing a total of 24.04 grams, two (2) baggies containing Fentanyl, also known as N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide, a Schedule II controlled substance weighing a total of 2.58 grams, one baggie of a mixture of hydroxy PCP and Fentanyl, also known as N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide, a Schedule II controlled substance weighing .35 grams, one baggie of Cocaine, a Schedule II controlled substance weighing .72 grams, and one baggie of hydroxy PCP weighing 24.04 grams.

8.     On July 27, 2022, U.S. Magistrate Judge Caroline H. Gentry signed an arrest warrant for **JOHNSON**. Based on the investigation, your Affiant believed **JOHNSON** knowingly possessed a firearm and ammunition in furtherance of a drug trafficking crime after being previously convicted of certain felony crimes each punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 924(c); additionally **JOHNSON** possessed, with intent to distribute, 10 grams or more of a mixture or substance containing a detectable amount of any analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi); and additionally was found in control of and actively maintaining a drug premises in violation of 21 U.S.C. § 856.

9.     On October 25, 2022, your Affiant was conducting surveillance of the exterior of **Location 1**. At approximately 1100 hours I observed a silver Chevy Impala with Ohio license plate HVQ9868 pull up from the rear of the house, and then depart the area. As said vehicle was leaving, it slowly drove past me, allowing me to observe the driver, who I immediately recognized as **JOHNSON**. I attempted to follow him, however lost sight of him a short time later. I then contacted DPD Officer Randy Betsinger and his partner officer James West, who were operating a marked DPD police cruiser. I provided them with the present location of the vehicle, as well as the vehicle description and requested they attempt to assist in taking **JOHNSON** into custody. Prior to them being able to respond, **JOHNSON** arrived back at the 4242 Gardendale Avenue address and went inside. **JOHNSON** was observed inside said premises for approximately 5-10

minutes, and again left in the same vehicle. I did not attempt to follow him. Approximately 5-10 minutes later, I watched **JOHNSON** pull back into the rear of said house. I informed Officers Betsinger and West, who pulled their cruisers into the back yard of **Location 1** and made contact with **JOHNSON** as he was getting out of the driver's seat. He was immediately taken into custody without incident.

10. I arrived on scene as **JOHNSON** was being handcuffed. Once secured, I advised him he was under arrest for several charges. I emptied **JOHNSON's** pockets and located a small baggie of marijuana as well as a large amount of U.S. Currency. This money was later counted and found to total $2,606. **JOHNSON** was also found in possession of several keys. Prior to being placed in the police cruiser, **JOHNSON** requested to get his cell phone from inside the house. He told me I could use the keys to enter the residence, and showed me the specific key to unlock the door. Once inside, he directed me to the kitchen area and advised his phone may be on the kitchen island counter top. I was unable to locate the phone there, however Officer Betsinger utilized the "chime" function on the Apple watch **JOHNSON** was wearing and I heard the phone beep across the kitchen, on the kitchen table. I walked to this phone and retrieved it from the table. As I was walking to the phone, I observed a baggie of yellow powder, which I believed to be illegal narcotics, sitting on the kitchen counter next to the sink. There were also 2 boxes of clear sandwich baggies sitting directly next to the bag of powder.

11. I exited the house and attempted to speak with **JOHNSON**. I advised him of his Miranda warnings, however he advised he did not wish to speak with me at that time.

12. Based upon the large amount of suspected narcotics observed inside the house, the two boxes of sandwich baggies, and the large amount of U.S. currency located on **JOHNSON**, all are consisted with evidence of a large-scale drug operation at **Location 1**.

## CONCLUSION

13. Based on the facts set forth in this Affidavit, I believe probable cause exists to

7

conclude evidence of drug trafficking activity will be found inside **Location 1**. Specifically, it is your Affiant's belief that evidence of violation of Title 21, United States Code § 841, can and will be found inside **Location 1.**

Dustin J. Phillips
Task Force Officer
Federal Bureau of Investigation


Sworn and subscribed before me via telephone on this 25th day of October, 2022.


Peter B. Silvain, Jr.
United States Magistrate Judge

## ATTACHMENT A

**Location 1:** The place to be searched is 4242 Gardendale Avenue, Dayton, Ohio 45417 and the surrounding curtilage.   4242 Gardendale Avenue, Dayton, Ohio is a one-story beige, single family home with a white front door and glass screen door with white metal bars.  4242 Gardendale Avenue is located on the south side of Gardendale Avenue. 4242 Gardendale Avenue, Dayton, Ohio 45417 is further depicted in the following photograph.



## ATTACHMENT B

### PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. § 841(a)(1) including, but not limited to:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I. Illegal drugs, including but not limited to fentanyl, and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J. Firearms and ammunition.